IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID SANCHEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:19-cv-277-ECM |
| | ) | (WO) |
| MANAGEMENT ENTERPRISE | ) | |
| DEVELOPMENT & SERVICES, INC., | ) | |
| *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

## I.    Introduction

Now before the Court are Defendant Management Enterprise Development &
Services, Inc.'s ("MEDS") and Defendant Frank Kendall III's[1] ("Air Force") respective
Motions for Summary Judgment. (Docs. 53, 55).  Plaintiff David Sanchez ("Sanchez")
brings claims of age and disability discrimination, and unlawful retaliation, against both
Defendants.  Because the Court agrees that the Defendants are entitled to judgment as a
matter of law, their respective motions for summary judgment are due to be GRANTED.

---

[1]  The named defendant is Heather A. Wilson, sued in her official capacity as Secretary of the Air Force.
Pursuant to Fed. R. Civ. P. 25(d), her successor, Frank Kendall III, is automatically substituted as a party.
For convenience and clarity, Kendall is referred to throughout as the "Air Force."

## II.    Background[2]

MEDS is a company that provides, among other things, physical therapist staffing to various health care facilities around the country.  Per a 2012 contract, MEDS provided physical therapy staff to the United States Air Force at Maxwell Air Force Base ("Maxwell") in Montgomery, Alabama.  The contract included a Performance Work Statement that required certain performance obligations as well as a 95% compliance with a Patient Sensitivity requirement that stated:

> Contract personnel shall respect and maintain the basic rights of patients, demonstrating concern for personal dignity and human relationships. Personnel receiving complaints validated by the COR and Chief of the Medical Staff shall be subject to counseling and, depending on the nature and severity of the complaint, separation from performing services under this contract.

(Doc. 57-2 at 21).

In September 2012, Sanchez was the physical therapist chosen for the job.  Sanchez, born in 1963, had previously spent fifteen years in the United States Navy as an air traffic controller and fifteen years in the Air Force as a physical therapist.  As he approached the end of his Air Force tenure, Sanchez began having orthopedic issues with his arms, legs, and spine, as well as vision problems.  Upon his departure, the Department of Veteran Affairs gave Sanchez a disability rating of 80%.

Sanchez was hired by MEDS thereafter to be Maxwell's staff physical therapist. However, though MEDS was Sanchez's ostensible employer, the contract between MEDS

---

[2]  Since this comes before the Court on the Defendants' motions for summary judgment, the Court construes the facts in the light most favorable to the non-movant, Sanchez, and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

and the Air Force indicated that Sanchez was "subject to the day-to-day supervision and control of employees of the United States." (*Id.* at 14). It further indicated that the "Quality Assurance Personnel and applicable Flight Commanders [would] provide the supervision and control where the services [would be] performed." (*Id.*).

Later, in October 2016, the Air Force appointed Major Erin O'Connor ("O'Connor") as the officer in charge of physical therapy at Maxwell, and thus, Sanchez's direct supervisor. Friction between the two began almost immediately.

Sanchez's claims spotlight several times the two clashed. Despite his orthopedic disabilities, Sanchez stayed active, often exercising during his lunch breaks and winning awards for triathlons outside of work. During one of Sanchez's lunch weightlifting sessions, O'Connor laughed at what he was able to lift, asked why he could only lift that much, and ridiculed him that he should be lifting more. (Doc. 57-1 at 18–19). Sanchez responded that he had a bad back and shoulder, and so could not lift any more.[3] Admittedly, Sanchez "didn't make much" of O'Connor's comments, but rather considered them to be sarcastic ribbing. (*Id.* at 22).

O'Connor's antagonism went beyond her weightlifting jokes. During a different incident, O'Connor called Sanchez a "scatterbrain." (*Id.* at 24–26). She also "put a fist up to [him], telling [him] not to mark her down on her peer review." (*Id.* at 13). Sanchez reported both incidents to a variety of MEDS and Air Force employees. However, at no time did O'Connor, nor anyone at MEDS, directly mention Sanchez's age or disability.

---

[3] It is unclear from the record how many incidents like this occurred, but Sanchez claims at least two.

As their animosity reached a peak, O'Connor sent emails complaining about Sanchez to other Air Force personnel, accusing him of failing to follow appropriate procedures, showing up late to work, failing to meet patient quotas, and staying at work past the close of his contract hours. That animosity also showed up on Sanchez's peer reviews. Each month during his employ, Sanchez was evaluated by his supervisor on factors like overall performance, adherence to work schedules, and patient and customer satisfaction. During much of his MEDS career, Sanchez's overall performance and patient satisfaction was evaluated as "satisfactory" to "exceptional." (*See* Doc. 61-7 at 1–20). However, when O'Connor began evaluating Sanchez, his scores dropped precipitously, sliding from satisfactory in May 2017 to unsatisfactory later that year. O'Connor also, on at least one evaluation, referred to Sanchez's therapy techniques as "old school." (Doc. 63-2 at 13).

Under O'Connor, Sanchez also began to receive more patient complaints. During the two years prior to O'Connor's arrival, Sanchez received only two patient complaints (one of which he was cleared of wrongdoing for). But after O'Connor became Sanchez's supervisor, additional patient complaints began to roll in (at O'Connor's urging patients to create a record of the occurrence):

- One complained that Sanchez "spoke down" to them, made them "feel like an idiot," and only spent five minutes out of a ninety-minute visit asking the patient's view on health. (Doc. 61-8 at 7). The patient also complained that Sanchez spoke extensively about his treatment philosophy but did not develop them a treatment plan. (*Id.*).

- One complained that Sanchez was the worst part of their six-week physical therapy regimen, and that he once walked out of a scheduled appointment without treating the patient. (*Id.* at 6).

- One complained that Sanchez stated he would not treat her because she was pregnant, and that she had nothing to show for their forty-minute meeting. (*Id.* at 11–12).

- One complained that Sanchez "called [them] fat and made jokes about [their] weight gain." (*Id.* at 9). They further complained that Sanchez told them they should go on the show "Naked and Afraid." (*Id.*).[4]

- One, in a comment card complimenting O'Connor's treatment, stated that Sanchez had "poor bedside manner." (*Id.* at 10).

- One complained that they "felt judged regarding [their] physical limitations" during a treatment session with Sanchez, and that Sanchez had grabbed their stomach fat during the session and noted that they did not possess muscles under the fat. (*Id.* at 3). The complainant hoped "other patients don't leave [Sanchez's] office feeling as demoralized as [they] did." (*Id.*).

- One stated that they were "[e]xtremely disappointed in [their] meeting/consultation with Dr. Sanchez," and complained that during the meeting, Sanchez "spent most of the time telling [them] how wrong [they] are in [their] fitness goals," a comment the patient found "accusatory instead of helpful." (Doc. 61-8 at 2). The patient deemed the visit "the most unproductive and worst visit [they've] ever had with a physician." (*Id.*).

Several complaining patients requested to be switched from Sanchez to O'Connor (and several complaints were received after patients made that switch). However, during the same period, Sanchez also received positive reviews, even as he saw a far greater number of patients than O'Connor did.

Amidst strife with O'Connor, in May 2017 Sanchez went to Lieutenant Colonel Ryan Mihata ("Mihata"), the Medical Operations Squadron Commander and O'Connor's

---

[4] Naked and Afraid is an American reality TV show in which contestants must survive, nude, in the wilderness for several weeks. Contestants often lose weight during the experience.

supervisor, to complain.  During that meeting, Mihata suggested that Sanchez's and O'Connor's disagreements stemmed from the fact that he was "out of touch with new concepts," and not "fresh from school" like O'Connor was.  (Doc. 61-5 at 6).  Mihata told Sanchez that he believed the dispute should "get worked out at the lowest level," but nevertheless thanked Sanchez for the intel. (*Id.*).

Despite Mihata's attempts to talk Sanchez down, Sanchez continued to alert MEDS and Air Force employees that he believed O'Connor was harassing and retaliating against him—though no such complaint explicitly mentioned any hostility or discrimination based on Sanchez's age or disability.  However, his complaints did state that he believed the harassment to be an "equal opportunity issue, which is escalating[,]" (doc. 63-6 at 5), and Sanchez discussed the prospect of taking his complaints to the Equal Employment Opportunity office with several MEDS and Air Force employees.  Sanchez eventually elevated his complaints to MEDS's human resources director, Sonya Harris ("Harris"), and to Maxwell's Chief of Medical Staff, Major Ross Graham ("Graham"), neither of whom ameliorated the situation.  In September 2017**,** Sanchez informed Graham that O'Connor had raised a fist to him, and that Mihata had told him that he was old and out of touch. Sanchez explained that he believed O'Connor's actions amounted to harassment and a hostile work environment, and that Mihata's comments were discriminatory because of Sanchez's age.  MEDS' CEO, Stanley McCall, was also copied on an email, sent by Harris, informing Nikki Klinger, the Air Force Service Contract Manager, that Harris had received a statement of harassment allegations from Sanchez.

Meanwhile, back in June 2017, Sanchez, MEDS, and Air Force personnel met to discuss Sanchez's complaints, as well as the Air Force's concerns about Sanchez's performance.  At the meeting, Sanchez complained of a poor working relationship with O'Connor, but did not raise any issue of age or disability discrimination or harassment. Either way, the meeting ended with MEDS believing the personal and professional issues Sanchez was having would be cleared up and required no further intervention (even though MEDS continued to follow up all the same).[5]

The problems did not clear up.  Instead, in October, the Air Force issued MEDS a Corrective Action Report, which noted that given the numerous complaints against him, Sanchez had failed to satisfy the Patient Sensitivity requirement of the MEDS-Air Force contract.  The next day, MEDS sent a letter to Sanchez, informing him that it had received complaints about his treatment of patients and demanding a plan of "immediate, corrective action" concerning his behavior. (Doc. 61-12 at 1).  That same day, Harris informed the Air Force that MEDS had done so, and that upon receipt of Sanchez's corrective plan, MEDS would determine what discipline was warranted.  She indicated that MEDS was considering a suspension or further training but did not mention potential termination.

Sanchez requested, and was granted, additional time to respond.  Sanchez obliged within the week, attempting to rebut some performance concerns while continuing to allege that O'Connor had established a "hostile/harassing/vindictive" work environment, and had sent him warnings as "retaliation." (Doc. 61-9 at 1).  He believed many of the complaints

---

[5] MEDS also addressed with Sanchez issues with his tardiness and his working late in August 2017.

to be misunderstandings or miscommunications, and argued that in many of the situations described, he was in the right. He also described in detail his disagreements with O'Connor, and complained about the incident with Mihata "hit[ting him] with age discrimination." (*Id.* at 9).

A few days later, McCall, MEDS's CEO, sent Sanchez a notice of termination. McCall explained that after reading Sanchez's response, he saw nothing there that was "within the CEO of MEDS['] authority to effect any change other than [Sanchez's] behavior." (Doc. 61-14 at 1). McCall made clear that there was "no acceptance of any responsibility from [Sanchez,] . . . [and] no demonstration of remorse, empathy or compassion for the patients." (*Id.*). Thus, McCall wrote, he "[could] not allow services provided under the name of MEDS to continue with this level of dissatisfaction," and so decided to terminate Sanchez. (*Id.*). Sanchez filed a charge of age and disability discrimination with the EEOC a month later.

Roughly a year after that, in September 2018, the MEDS contract with the Air Force expired and was not renewed. Seven months later, Sanchez filed suit. He now brings nine total claims: claims of unlawful age discrimination and retaliation pursuant to the Age Discrimination in Employment Act ("ADEA") against MEDS and the Air Force (Counts I, II, V and VI); unlawful discrimination on the basis of a disability and retaliation pursuant to the Americans with Disabilities Act ("ADA") against MEDS (Counts III and VII); and unlawful discrimination on the basis of a disability and retaliation pursuant to the Rehabilitation Act against the Air Force (Counts IV and VIII). Both Defendants moved for summary judgment on all claims, motions to which the Court now turns.

### III.    Jurisdiction

The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331.  There remains a question (discussed below) of whether the Air Force has waived sovereign immunity for the claims that Sanchez brings, and thus whether the Court has subject matter jurisdiction over them.  The parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

### IV.    Analysis

A reviewing court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Only disputes about material facts will preclude the granting of summary judgment. *Anderson*, 477 U.S. at 249.  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-movant must support his assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

In determining whether a genuine issue for trial exists, the Court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the Court must draw all justifiable inferences from the evidence in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

### a. **MEDS' Motion for Summary Judgment**

Against MEDS, Sanchez brings claims of unlawful age and disability discrimination in violation of the ADEA (Count I) and the ADA (Count III), respectively.  The ADEA prohibits an employer from discharging, "or otherwise discriminat[ing] against any individual [over the age of forty] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a).  Similarly, the ADA prohibits covered entities from discriminating "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or

discharge of employees . . . and other terms, conditions, and privileges of employment."
42 U.S.C. § 12112(a).  Sanchez argues he has shown that a genuine issue of material fact
exists as to MEDS' intention in terminating him, and thus that summary judgment is
improper.  MEDS disagrees, arguing that it is entitled to summary judgment because
Sanchez has not demonstrated a *prima facie* case of age or disability discrimination, or in
the alternative if he has, that Sanchez cannot demonstrate that MEDS' proffered
explanation is little more than pretext for unlawful discrimination.[6]

The Court turns first to Sanchez's claim of age discrimination.  Age discrimination
can be established through either direct or circumstantial evidence. *Van Voorhis v.*
*Hillsborough Cnty. Bd. of Cnty. Commr's*, 512 F.3d 1296, 1300 (11th Cir. 2008) (citation
omitted).  Sanchez explains that his claim rests only upon circumstantial evidence. (Doc.
61 at 22).  To establish a circumstantial case of age discrimination, Sanchez must satisfy a
burden shifting framework. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th
Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  First,
Sanchez must establish a *prima facie* case of discrimination. *See Lewis v. City of Union*
*City* (*Lewis I*), 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).  To do so, he must
demonstrate "(1) that [he] belongs to a protected class, (2) that [he] was subjected to an

---

[6]  MEDS also argues that it is entitled to summary judgment because Sanchez asserts several claims that
are each analyzed under a but-for test of causation.  MEDS contends that since Sanchez's age and alleged
disability cannot *both* be but-for causes of his termination, summary judgment is appropriate for both
claims.  This argument appears foreclosed by the Supreme Court's language in *Bostock v. Clayton County*,
140 S. Ct. 1731, 1739 (2020) ("Often, events have multiple but-for causes."); *see also Keller v. Hyundai*
*Motor Mfg.*, 513 F. Supp. 3d 1324, 1330 (M.D. Ala. 2021) (explaining that the same argument "crashes,
Wile E. Coyote-esque, into veritable mountains of contrary precedent" and citing *Bostock*).  However,
because Sanchez's claims fail on other grounds, the Court here assumes without deciding that a plaintiff
can sustain multiple claims subject to but-for causation analysis.

adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Id.* (citations omitted).  If he shows all four, the burden shifts to MEDS to "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If MEDS meets its "exceedingly light" burden of production, *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983), the burden returns to Sanchez to demonstrate that MEDS' reason is just pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations omitted).  While the burden of *production* shifts, the burden of *persuasion* "always remains on [Sanchez] . . . to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (citation omitted).

MEDS argues that Sanchez fails to produce sufficient evidence to establish a *prima facie* case of age discrimination.  To demonstrate a *prima facie* case of age discrimination in violation of the ADEA, Sanchez must demonstrate that he was (1) over the age of forty; (2) subject to an adverse employment action; (3) was replaced by someone substantially younger than himself; and (4) was qualified to do the job. *Liebman*, 808 F.3d at 1298 (citation omitted).  It is undisputed that Sanchez is over the age of forty and was subject to an adverse employment action (*i.e.*, his termination).  However, Sanchez points to no evidence that someone "substantially younger" than himself assumed his role (or was treated better than him in any capacity).  That alone dooms his ability to demonstrate his

*prima facie* case and his concomitant burden under *McDonnell Douglas*.  Sanchez does not argue otherwise—though he spends considerable time explaining how he was treated on the job, he does not explain how this treatment establishes a *prima facie* case of age discrimination under *McDonnell Douglas*.

Instead, Sanchez notes that even if he cannot meet his burden under *McDonnell Douglas*, the shifting framework is "not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case." (Doc. 61 at 22 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  Sanchez can also survive summary judgment if "he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Sims*, 704 F.3d at 1333 (citation omitted).  Such an issue of fact exists "if the record, viewed in a light most favorable to [Sanchez], presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination *by the decisionmaker*." *Id.* (emphasis added) (quotations and citation omitted).  Sanchez can tile a convincing mosaic if he points to evidence like "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City* (*Lewis II*), 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations and citation omitted).

Sanchez does not do so.  His age discrimination claim rests upon only two comments—that O'Connor called him "scatterbrain" and Mihata said he was "out of touch," unlike O'Connor—not uttered by anyone employed by MEDS or directly involved

in the decision to terminate him. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999) (holding "comments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous," and collecting cases).[7] Sanchez does not point to any statement nor any suspicious timing in his termination process that suggests discriminatory animus *by the decisionmaker*, MEDS CEO McCall.[8]

Sanchez also fails to argue for or produce evidence of any systematic treatment of similarly situated employees that was better than he received.  He provides no evidence or argument that indicates *MEDS* treated a similarly situated employee better than it treated him.  Instead, Sanchez admits that O'Connor, the focus of his claim (but who is not employed by MEDS), acted with hostility towards other providers in the clinic and was generally strict to everyone regarding perceived failures in their standard of care. (Doc. 57-1 at 30).

Nor does Sanchez support that MEDS' justification was pretextual.  "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).  Instead, Sanchez needs to meet MEDS' justifications

---

[7]  Discriminatory animus could also be demonstrated if Sanchez shows that McCall, following the biased recommendation of O'Connor, terminated him without independently investigating the complaints against him—a theory of liability known as the "cat's paw." *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  Sanchez neither asserts nor argues any such theory of liability is applicable to this case, and the record does not demonstrate that O'Connor recommended McCall terminate Sanchez or otherwise influenced his decision in any way.

[8]  And any such showing would be difficult to make: McCall is *older* than Sanchez. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (noting the plaintiff "face[d] a difficult burden . . . because all of the primary players behind his termination . . . were well over age forty and within the class of persons protected by the ADEA," making them "more likely to be the victims of age discrimination than its perpetrators").

"head on and rebut [them]." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1314–15 (11th Cir. 2016) (quotations and citation omitted).  The evidence he produces must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotations and citation omitted).  It does not matter what Sanchez thinks or what the "reality as it exists outside of the [decisionmaker's] head" is—all that matters is what McCall believed. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th Cir. 2021) (quotations and citation omitted).

Sanchez does not reveal any such incoherencies.  He acknowledges that the complaints were written by patients, were valid, and, from MEDS' perspective, were worth acting on.  Sanchez does not argue (or even allege) that the complaints against him were fabricated or hyperbolic.  For months, MEDS maintained that it was concerned about his negative patient reviews.  It met with Sanchez before the Air Force issued its Corrective Action Report, gave him a warning and an (extended) chance to respond to the report after it was issued, and fired him for explicated reasons consistent with its earlier concerns. Nothing Sanchez produces lays a "convincing mosaic" that would present a triable question of fact about MEDS' intent in firing him.

All told, Sanchez does not establish that his age "actually played a role in [MEDS'] decisionmaking process and had a determinative influence on the outcome," *McQueen v. Wells Fargo*, 573 F. App'x 836, 839 (11th Cir. 2014) (quoting *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)), and so summary judgment as to Count I is due to be granted to MEDS.

Sanchez's claim of disability discrimination in violation of the ADA, Count III, fails for the same reasons.[9]  Just as with age discrimination under the ADEA, disability discrimination under the ADA can be proven through direct or circumstantial evidence. *See Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1262–63 (S.D. Fla. 2020) ("To establish a case of intentional discrimination in violation of the ADA, a plaintiff may rely on direct or circumstantial evidence . . . .").  Direct evidence of discrimination is evidence that "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Id.* (quotations and citation omitted).  It is evidence "which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted).  By comparison, stray remarks, "statements by nondecisionmakers or statements by decisionmakers unrelated to the decisional process at issue" are insufficient to be direct

---

[9]   The ADA recognizes three theories of disability discrimination:  disparate treatment, disparate impact, and a failure to reasonably accommodate.  *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1209 (11th Cir. 2008).  The three theories require different showings by the plaintiff—"the central difference between disparate treatment and disparate impact claims is that disparate treatment requires a showing of discriminatory intent and disparate impact does not."  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000) (citation omitted).  Though Sanchez does not make explicitly clear under which theory he proceeds, he argues that MEDS discriminated against him *because* he is disabled and, in its eyes, unable to perform his job, rather than via application of some facially neutral policy (the foundation of a disparate impact claim), or because he required an accommodation that was not provided. Accordingly, the Court treats his claim as one of disparate treatment.

evidence of discrimination. *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (quotations and citation omitted).  So too is evidence that only *suggests* discrimination, *see Earley v. Champion International Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990), or that is subject to multiple interpretations, *see Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), insufficient to constitute direct evidence.

Unlike with his ADEA discrimination claim, Sanchez is not explicit about whether he believes the evidence of disability discrimination he proffers is direct or circumstantial. However, he points to nothing so egregious as to qualify as direct evidence of discrimination.  Sanchez's disability discrimination claim rests on a single kind of incident: that O'Connor teased him about how much weight he could lift, said he should be lifting more, and occasionally smirked at him.  O'Connor's comments differ in kind from those recognized as direct evidence of discrimination. *See, e.g.*, *Schultz*, 465 F. Supp. 3d at 1263 ("For example, in an ADA case, a decisionmaker's blanket statement that people with a certain disability are not competent to perform a particular job would amount to direct evidence of discrimination." (quotations and citation omitted)).  O'Connor's comment neither directly mentions, nor alludes to, Sanchez's (or anyone else's) disability, and makes no reference to how his disability affects his qualifications as a physical therapist.  At best, O'Connor's statements reach Sanchez's disability only through an attenuated inference, the kind insufficient to constitute direct evidence of discrimination.  And, of course, O'Connor is not a MEDS employee, nor the decisionmaker in Sanchez's termination. Sanchez points to no evidence that someone in the employ of *MEDS* made any comment directly discriminatory about his disability—on the contrary, he admits that no one did.

So instead, Sanchez must support his claim with circumstantial evidence by satisfying the same shifting *McDonnell Douglas* framework. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). [10]  First, Sanchez must establish a *prima facie* case of disability discrimination by showing that he is disabled, otherwise qualified to perform the job, and that he was discriminated against based upon his disability.  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).  The next two steps proceed the same way as in the ADEA context: if Sanchez satisfies his *prima facie* burden, MEDS must produce a legitimate, nondiscriminatory reason for the adverse employment decision, which Sanchez must then rebut as pretextual. *Lewis I*, 918 F.3d at 1221 (citation omitted).

As an initial matter, the Court assumes without finding that Sanchez satisfies his *prima facie* case and establishes a presumption of discrimination.   However, that presumption of discrimination falls away once MEDS produces sufficient evidence demonstrating a non-discriminatory purpose for the challenged adverse action.   MEDS satisfies this "exceedingly light" burden of production:  it provides substantial evidence that Sanchez's termination was predicated upon numerous patient complaints—and Sanchez's failure to accept responsibility for those complaints—rather than upon any discrimination.

---

[10]   MEDS indicates it believes that whether the *McDonnell Douglas* framework applies to ADA claims after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), is an open question in the Eleventh Circuit.   However, the Eleventh Circuit has continued to apply the framework in just those sorts of cases post-*Gross*. *See Todd*, 998 F.3d at 1215–19 (applying *McDonnell Douglas* in an ADA discrimination claim); *Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018) (applying *McDonnell Douglas* in an ADA retaliation claim).

Thus, the burden returns to Sanchez to demonstrate that MEDS' proffered reason was merely pretext for disability discrimination. He must "cast sufficient doubt on [MEDS'] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Crawford*, 529 F.3d at 976 (quotations and citation omitted).

Once again, he fails to do so: Sanchez produces no evidence to indicate that McCall's reasons were pretextual. As noted, Sanchez himself admits that the complaints are real, that (in most cases) he did the complained-of act, that they were worthy of (at a minimum) investigation, and that he could not recall McCall, nor anyone else at MEDS, ever saying or doing anything discriminatory towards him.

Nevertheless, Sanchez makes two different arguments. First, he asserts that the complaints were largely subjective, complaining about things like his bedside manner or how his style of treatment differed from the treatment the patients themselves preferred. But Sanchez does not make clear why MEDS was obligated to treat subjective complaints differently, or demonstrate that MEDS normally treats those complaints differently such that its departure *here* gives rise to an inference of discrimination.

Sanchez also argues that MEDS did not consider his positive reviews in terminating him. Maybe so. But the Court is "not in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). MEDS was free to consider only the complaints against Sanchez, rather than praise for him, if it so chose, so long as that decision did not rest on a discriminatory basis. But Sanchez produces no evidence that it did—he does not

demonstrate anything that would allow a jury to "reasonably infer discrimination" by McCall in making that choice. *Id.* (quotations and citation omitted).

All told, Sanchez does not point to *any* weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in MEDS' justifications, let alone enough to allow a factfinder to call MEDS' justifications into doubt. He does not demonstrate "*both* that the [proffered] reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotations and citation omitted) (emphasis in original). As such, Sanchez does not satisfy his burden under the *McDonnell Douglas* framework and so summary judgment as to Count III is due to be granted for MEDS.[11]

Separate from his discrimination claims, Sanchez also brings claims of unlawful retaliation pursuant to the ADEA and the ADA (Counts V and VII, respectively). The ADEA prohibits retaliation against any employee who "has opposed any practice made unlawful by [the ADEA], or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). The ADA prohibits retaliation in identical circumstances. 42 U.S.C. § 12203(a). MEDS argues it is entitled to summary judgment on both claims because Sanchez cannot demonstrate he was engaged in statutorily protected activity or, in the alternative, that any such act was the but-for cause of his termination.

---

[11] Just as the *McDonnell Douglas* framework is not "the *sine qua non* for a plaintiff to survive a summary judgment motion" in an ADEA case, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), neither is it so in the ADA context. But Sanchez does not argue that what he produces lays a convincing mosaic that would allow a jury to infer MEDS possessed a discriminatory intent based on his disability when it terminated him.

Claims of discriminatory retaliation are analyzed under the same *McDonnell Douglas* burden-shifting framework. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (ADEA); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA). To demonstrate a *prima facie* case of discriminatory retaliation, Sanchez must show that "(1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between" the two. *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006) (citations omitted). If he does so, the burden again shifts to MEDS to produce legitimate reasons for the adverse employment action, which Sanchez must then show to be mere pretext. *Hairston*, 9 F.3d at 919. It is again undisputed that Sanchez was adversely affected by an employment decision—his termination.

Sanchez must first demonstrate that he engaged in statutorily protected conduct. "Statutorily protected activity includes complaining to superiors of harassment or discrimination and lodging complaints with the EEOC." *Davis v. Dunn Const. Co.*, 872 F. Supp. 2d 1291, 1315 (N.D. Ala. 2012) (citing *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) and *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002)). Since he asserts he was retaliated against because he complained to superiors, Sanchez must demonstrate he "*subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in

original).[12]  The reasonableness of Sanchez's belief is measured by reference to controlling substantive law. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

Nothing in the record suggests that Sanchez complained of *unlawful age or disability* discrimination *by MEDS*.  Though Sanchez did complain generically of harassment by and hostility from O'Connor, as well as of age discrimination by Mihata, nothing indicates that Sanchez contemporaneously believed of—or reported—any harassment at the hands of a *MEDS employee*.[13]  Sanchez admitted that he could not recall a time when anyone employed by MEDS did or said anything harassing to him.  Thus, he has not demonstrated he possessed even the *subjective* belief that MEDS was acting in a discriminatory manner.

The record also lacks any indication that such a belief, had Sanchez held it, would have been *objectively* reasonable.  Sanchez admits that MEDS never said anything about his age or disability, and that he has no evidence that they ever treated him differently based on either characteristic.  Without any comment or action by MEDS that is the least bit

---

[12]  Though *Little* involved a claim under Title VII, the Eleventh Circuit has imposed the same requirements in the ADA and ADEA contexts. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–12 (11th Cir. 2002).

[13]  He also did not indicate in any of his complaints that he believed O'Connor's comments to be discriminatory towards his age or disability.  Without doing so, such complaints are not protected activity. *See, e.g.*, *Wood v. Cellco P'ship*, 2008 WL 220085, at *5 (M.D. Fla. Jan. 24, 2008) ("General complaints of 'harassment' or a 'hostile environment' without suggestion that the mistreatment is based on [a protected characteristic] do not constitute statutorily protected activity." (citations omitted)).

discriminatory, no rational jury could find a belief that MEDS was discriminating against Sanchez based on his age or disability to be objectively reasonable.[14]

All told, Sanchez fails to overcome his burdens to demonstrate unlawful discrimination or retaliation by MEDS.  As such, summary judgment is due to be granted for MEDS on all claims brought against it.

      b.     **The Air Force's Motion for Summary Judgment**

Sanchez brings similar claims against the Air Force:  that he was unlawfully discriminated against on account of his age (Count II) and disability (Count IV), and was unlawfully retaliated against, in violation of the ADEA (Count VI) and the Rehabilitation Act (Count VIII). The Air Force moved for summary judgment, arguing that it is not Sanchez's employer and thus has not waived sovereign immunity as to his claims.  In the alternative, the Air Force argues that Sanchez fails to support a *prima facie* case of discrimination or retaliation, and so it is entitled to summary judgment on the merits.

To start, the Court first flies into the Air Force's sovereign immunity thicket. "Sovereign immunity is jurisdiction in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The "terms of [the United States'] consent to be sued in any court define that court's

---

[14]  Even if Sanchez could show he engaged in statutorily protected activity, he fails to demonstrate a causal connection between that activity and his later termination.  To demonstrate a causal relationship, Sanchez must demonstrate "that the [decisionmakers were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quotations and citation omitted) (alterations in original).  While the record indicates that McCall knew Sanchez was complaining about harassment more broadly, it does not indicate that McCall knew that Sanchez believed he was subject to *unlawful age or disability discrimination* by MEDS. Without that connection, Sanchez cannot establish a causal relationship.  But even so, if he could do so, he also fails to demonstrate that MEDS' proffered legitimate explanation for his termination was pretextual, for the same reasons set out above.

jurisdiction to entertain the suit." *Id.* (quotations and citation omitted) (alteration in original). As a branch of the United States military, the Air Force is entitled to sovereign immunity unless it has been unequivocally waived by statute. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Id.* (citation omitted). Any such "waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

The Government has indeed waived sovereign immunity for claims of age[15] and disability[16] discrimination and retaliation. However, those waivers only extend to "employees" of the Government, as defined by each act. The ADEA, unhelpfully, "does not provide guidance as to the scope of the term 'employee,' beyond defining an 'employee' as 'an individual employed by any employer.'" *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 961 (11th Cir. 2015) (quoting 29 U.S.C. § 630(f)). Similarly, the Rehabilitation Act defines an employee by reference to provisions of the Civil Rights Act of 1964, which itself defines "employee" in the same way. *See* 29 U.S.C. § 794a; 42 U.S.C. § 2000e(f) ("The term 'employee' means an individual employed by an employer.").

---

[15] The ADEA bars discrimination based on age for all federal employees "who are at least 40 years of age . . . in military departments [like the Air Force.]" 29 U.S.C. § 633a. The ADEA also permits retaliation claims by federal employees against the federal government. *See Gomez-Perez v. Potter*, 553 U.S. 474 (2008).

[16] The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, forbids federal agencies from discriminating in the employment of an otherwise qualified individual with a disability. *See* 29 U.S.C. § 791; *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000). It also prohibits employers from retaliating against an individual who participates in an activity otherwise protected by the statute. 29 U.S.C. § 791(f) (incorporating the ADA's anti-retaliation provisions). "The standard for determining liability under the Rehabilitation Act is the same as that under the ADA." *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999).

Neither definition "get[s] us very far." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998). Instead, when the statute includes "such a 'nominal definition' to define the term 'employee,' Congress intended to 'describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1296 (11th Cir. 2016) (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444–45 (2003)). "Consistent with the remedial purposes [of antidiscrimination laws], the federal courts have interpreted the term 'employer' liberally." *Peppers*, 835 F.3d at 1297 (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994)). The Air Force asserts that Sanchez is not its employee, and as such, no waiver of sovereign immunity exists as to the claims he raises. Therefore, it argues, this Court lacks subject matter jurisdiction.

There are two types of attacks on the Court's subject matter jurisdiction. "Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint," whereas "[f]actual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003). "In adjudicating a facial attack, 'the district court takes the allegations as true in deciding whether to grant the motion.'" *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020) (quoting *Morrison*, 323 F.3d at 925)). "By contrast, when a court confronts a 'factual' attack, it needn't accept the plaintiff's facts as true; rather, 'the district court is free to independently weigh facts' and make the necessary findings." *Id.* (quoting *Morrison*, 323 F.3d at 925).

The Government here launches a factual attack.  The Air Force argues that things are as they seem:  the Air Force did not have a traditional employment contract or agreement with Sanchez, and it lacked sufficient control over the essential aspects of Sanchez's employment to be considered his employer.  Sanchez, by contrast, asserts that appearances are deceiving:  though the Air Force was not ostensibly his employer, it nevertheless exerted enough control over the contours of his job to be considered his "joint employer" for purposes of discrimination law liability.

Though a defendant may not "employ" a plaintiff in the traditional sense, it may nevertheless be considered a "joint employer" for purposes of liability under anti-discrimination statutes. *See Virgo*, 30 F.3d at 1359–61.  An entity is considered a joint employer if it exercises "sufficient control over the terms and conditions of employment of the employees who are employed by [another] employer." *Id.* at 1360 (quotations and citation omitted).  When deciding whether a defendant is a joint employer, the Court considers factors like "how much control the alleged employer exerted on the employee, and . . . whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Peppers*, 835 F.3d at 1297 (quotations and citations omitted).  The Court must, at base, answer the basic question of "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (en banc).

Courts have applied the joint employer doctrine "to the government . . . in the context of the government's liability for discrimination against individuals who . . . are

nominally employed only by a government contractor." *Walters v. Winter*, 2008 WL 11340071, at *1 (N.D. Fla. Nov. 17, 2008) (collecting cases). However, "[t]he government has prevailed in most of these cases. . . . [A]n employee of a government contractor who asserts she was jointly employed by the government faces an uphill battle." *Id.* at *1–2.

The Air Force and Sanchez agree on the broad contours of their employment relationship. They both agree that the Air Force was not involved in Sanchez's hiring and did not set or provide his pay. Beyond that, however, the two disagree on the amount of control the Air Force retained over Sanchez's employment. Sanchez argues that the Air Force had sufficient control over his everyday work life to be considered his joint employer. He testifies that the Air Force determined his work hours; his job duties; the standards he should meet; which patients he needed to evaluate; when he should discharge patients; the language and abbreviations he was to use in his patient charts; which specific treatments to prescribe, and how often to perform those treatments; when his patients should arrive at their appointments; conducted his peer and supervisory performance reviews; and had a direct hand in his termination.

The Air Force differs on the details. It argues that it did not set Sanchez's daily job responsibilities, did not decide how long Sanchez would work, or decide whether he (or any particular therapist) should be retained. In the Air Force's view, Sanchez "operated on [his] own schedule[], saw and evaluated patients separately, and drew up patient plans independently and without much oversight." (Doc. 54 at 35 (quotations and citation omitted)).

While the Air Force makes much of the fact that Sanchez's conception of his employment relationship is conveyed in his "self-serving statements [from his] 2020 deposition and in his newly attached declaration," (doc. 64 at 13), the Court is less concerned. The Air Force misconstrues what is contained within the deposition and declaration. Rather than nakedly asserting the *conclusion* that the Air Force is his joint employer, Sanchez provides factual examples of the Air Force's considerable control over his everyday work—from directing which treatments to use to telling him how to fill out his patient charts. The declaration and the deposition *themselves* are the evidence upon which Sanchez relies. Obviously, Sanchez's "sworn statements are self-serving, but that alone does not permit [the Court] to disregard them at the summary judgment stage." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc). What the Air Force wants is *corroboration* for Sanchez's factual statements—but at this stage, Sanchez is not required to provide what the Air Force seeks. *See Stein*, 881 F.3d at 855 ("We hold that an affidavit . . . may create an issue of material fact and preclude summary judgment even if it is self-serving and *uncorroborated*." (emphasis added)).

Thus, cast in the light most favorable to Sanchez, there remains a genuine dispute of fact as to the extent of the Air Force's control over Sanchez, and by extension, as to Sanchez's employment status. In normal circumstances, since this factual dispute goes to the Court's jurisdiction, the Court would be "'free to independently weigh facts' and make the necessary findings" to satisfy itself of its jurisdiction. *Gardner*, 962 F.3d at 1340

(quoting *Morrison*, 323 F.3d at 925)).  But the Court may not do so "[i]f the facts necessary to sustain jurisdiction . . . implicate the merits of the plaintiff's cause of action," *Garcia v. Copenhaven, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997).  If those jurisdictional facts implicate the merits of the plaintiff's action, the basis for the Court's jurisdiction is said to be "intertwined" with the merits, such as when "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Morrison*, 323 F.3d at 926 (quotations and citation omitted).  In that unique instance, "[t]he proper course of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020) (quoting *Morrison*, 323 F.3d at 925) (alterations in original).  "Judicial economy is best promoted when the existence of a federal right is directly reached, and where no claim is found to exist, the case is dismissed on the merits." *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981), *cert. denied*, 454 U.S. 897 (1981).[17]

That is precisely the situation the Court faces here.  The Air Force's argument for sovereign immunity, and against this Court's jurisdiction, is more complicated than whether a waiver of sovereign immunity itself exists by statute—a waiver unequivocally *does* exist for anti-discrimination claims by federal employees.  Rather, the Air Force argues that a waiver does not exist *here* because Sanchez cannot demonstrate a component

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

of his claim on the *merits*:  *his* status as an employee. *See, e.g.*, *Kaiser v. Trofholz Techs., Inc.*, 935 F. Supp. 2d 1286, 1290–92 (M.D. Ala. 2013) (finding that a defendant's "status as [the plaintiff's] employer is a nonjurisdictional element of [the plaintiff's] substantive cause of action"); *Garcia*, 104 F.3d at 1267 (holding that a plaintiff's status as an employee—and conversely, the defendant's as an employer—is "an element of an ADEA claim"); *cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006) (holding that whether an entity has enough employees to meet the statutory definition of "employer" under Title VII is "an element of a plaintiff's claim for relief, not a jurisdictional issue").  The Air Force attacks this Court's jurisdiction on factual grounds, the basis of which both defines the scope of the federal government's waiver of sovereign immunity and comprises an element of Sanchez's claim.

Granted, this case presents a slightly different procedural posture than *Garcia* (or the similar cases *Morrison* and *Gardner*).  Whereas in those cases, the trial court had dismissed the case pursuant to a Rule 12(b)(1) motion, and in doing so, resolved disputed questions of fact that it should not have done under the Rule 12(b)(6) or Rule 56 standards (had they been properly applied as required), here, the Court is already faced with a Rule 56 motion for summary judgment.  Accordingly, the question is slightly different:  the Court must decide whether, after treating the Air Force's attack on this Court's jurisdiction as one going to the merits of Sanchez's claim such that the Court is not allowed to resolve disputes of fact, the Court is permitted to address *other* merits questions before resolving the dispute that *would* go to the Court's own jurisdiction.

The Eleventh Circuit does not appear to have answered that question directly.  It has indicated on at least one occasion that a question of sovereign immunity, at least in the Eleventh Amendment context, "must be resolved before a court may address the merits of the underlying claims," *Seaborn v. Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–103 (1998)). However, that case emerged from a very different procedural posture in which the appellee Florida asserted for the first time on appeal that it was entitled to Eleventh Amendment immunity from the appellants' claims of disability discrimination. *Id.*  The court was not faced with (and unsurprisingly, did not address) the question the Court addresses here.

Other circuits have held that merits questions outside of sovereign immunity considerations can be addressed prior to resolution of immunity. *See, e.g.*, *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001–02 (D.C. Cir. 1999) (holding that since federal sovereign immunity is "a less than pure jurisdictional question," the court need not resolve it "before the merits"); *Scott v. Potter*, 182 F. App'x 521, 523 n.1 (6th Cir. 2006) ("Although the sovereign-immunity question is a jurisdictional one, we have discretion to address first the merits of the underlying claim."). *But see Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 733–43 (D.C. Cir. 2021) (Katsas, J., concurring) (arguing forcefully that *In re Sealed Case* was wrongly decided, both as a matter of circuit law as well as under applicable Supreme Court precedents, and collecting cases of the opposite approach).

Given that the Eleventh Circuit has not yet weighed in on whether, after applying the *Garcia* principle and treating the jurisdictional attack as one on the merits, the Court must address *that* merits question first, the Court assumes it need not do so.  Though the

31

Court is sensitive that "the core principles of a limited federal judiciary and respect for sovereign entities' immunity from unconsented-to suits clearly cut against proceeding when jurisdiction remains uncertain," *Douglas v. United States*, 814 F.3d 1268, 1281 (11th Cir. 2016) (Tjoflat, J., concurring), the burdens that motivate that idea are not present here. Discovery has already been conducted and the parties have already spent considerable time investigating and arguing the merits of Sanchez's claims.  The Government is not further burdened by the Court following *Garcia*, proceeding to the merits, and then resolving the merits in the order it chooses. Accordingly, the Court finds that because the Air Force's jurisdictional attack in intertwined with the merits of Sanchez's underlying claims, it is proper to assume that jurisdiction exists and proceed to whichever merits question it so chooses. [18]

And on the merits, Sanchez's claims fail.  To start, Sanchez's claims against the Air Force rest on the same conduct as his claims against MEDS.  O'Connor's and Mihata's statements remain insufficiently direct to constitute direct evidence of discrimination or retaliation, and so once again, Sanchez must establish his claims of discrimination and retaliation through reliance on the *McDonnell Douglas* burden-shifting framework.

On his ADEA discrimination claim, Sanchez fails to demonstrate a *prima facie* case of age discrimination.  Though he is over the age of forty and was subject to an adverse

---

[18]  The Court could, consistent with *Garcia* and *Morrison*, frame what it is doing in a different way:  since the question of whether the Air Force employed Sanchez is inextricable from the merits of the underlying claim, and because Sanchez's claims fail on the merits for other reasons, the factual dispute over how much control the Air Force has over Sanchez is immaterial—Sanchez loses on the merits regardless. *See Redwing Carriers, Inc.*, 94 F.3d at 1496 ("An issue is 'material' if it might affect the outcome of the case under the governing law." (quoting *Anderson*, 477 U.S. at 248)).

employment action,[19] he does not demonstrate that he was replaced by someone outside the protected class (or demonstrate that anyone outside that class was treated systematically better than he was). *See Liebman*, 808 F.3d at 1298 (explaining that to establish a *prima facie* case of age discrimination, a plaintiff must demonstrate "a substantially younger person filled the position from which he was discharged"). Just as it did with respect to MEDS, so too here does the failure to demonstrate his *prima facie* case doom Sanchez's ADEA discrimination claim, and so summary judgment is due to be granted to the Air Force as to Count II.

Sanchez's disability discrimination claim falls the same way. To succeed on a discrimination claim under the Rehabilitation Act, Sanchez must show that he was fired "by reason of" his disability. *Kornblau*, 86 F.3d at 193. Inherent in that is that Sanchez's employer *knew* of his disability prior to his firing. *See Williamson v. Clarke Cnty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1322–23 (S.D. Ala. 2011) ("It is well established in this Circuit that a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee because of that disability." (quotations and citation omitted)); *see also Morisky v. Broward Cnty.*, 80 F.3d 445, 448–49 (11th Cir. 1996) (affirming a grant of summary judgment when the plaintiff produced no evidence that the defendant knew of the plaintiff's disability); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("If [an employer] does not know of the disability, the employer is firing the employee 'because of' some other reason.").

---

[19] While the Air Force contests whether Sanchez was subject to an adverse employment action *by the Air Force*, the Court assumes without deciding that he was.

Even if Sanchez can demonstrate that he is disabled, which the Court again assumes without deciding, he does not demonstrate that anyone employed at the Air Force *knew* about his disability.  He does not show that he ever "informed any of the employees of [the Air Force] of [his] specific disability," *Morisky*, 80 F.3d at 448, or that his disability was so plain as to be "obvious to the casual observer," *Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1334 (M.D. Ala. 1998).

Instead, all Sanchez provides are vague assertions he made to O'Connor in response to her teasing, in which he said he "ha[s] a bad shoulder" and "bad back," (Doc. 57-1 at 19).  In context, however, it is difficult to see how these comments lead to the inference Sanchez implicitly asserts.[20]  During his time at Maxwell, Sanchez was an award-winning triathlete, and worked out in the gym almost daily.  Sanchez does not point to any other occasion in which he brought up his disability with the Air Force, nor point to any other way the disability impacted his work at Maxwell.  Mere conclusory assertions by Sanchez that he has a bad back or shoulder, divorced from any medical explanation or other physical manifestation, are insufficient to make the Air Force aware of those disabilities. *See Morisky*, 80 F.3d at 448 ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.").  Without knowledge that Sanchez was disabled, the Air Force could not

---

[20] Sanchez does not explicitly address in his brief the Air Force's argument that it lacked knowledge of his disability.

discriminate against him on that basis, and so summary judgment is due to be granted to the Air Force as to Count IV.[21]

Sanchez's disability retaliation claim against the Air Force also fails.  Just as with his claim against MEDS, Sanchez does not demonstrate that he participated in statutorily protected activity.  Sanchez produces no evidence that, prior to his termination, he held even a *subjective* belief that the Air Force was engaging in unlawful disability discrimination.  Sanchez points to no email, complaint, or conversation prior to his termination in which he complained to the Air Force that he believed O'Connor's comments on his weightlifting constituted unlawful *disability* discrimination.  While it is true that Sanchez repeatedly complained of discrimination and harassment, he failed to specify or imply any unlawful basis that he believed such behavior was based on.  That Sanchez may have considered the comments rude, hurtful, or "discrimination" in a broad sense is not the same as believing that they were unlawfully discriminatory *because of his disability*.  Only the latter constitutes protected activity. *See, e.g.*, *Wood*, 2008 WL 220085, at *5.  Without some indication that he complained of *disability* discrimination to his Air Force supervisors, his claim of retaliation based on such a complaint must necessarily fail.

Sanchez's age retaliation claim fails for a different reason.  To start, the Court assumes without finding that Sanchez has satisfied his *prima facie* case of ADEA retaliation.  But the Air Force points to the same legitimate reasons for Sanchez's

---

[21]  Alternatively, if Sanchez *were* able to demonstrate that the Air Force knew of his disability, he nevertheless fails to demonstrate that its proffered justification for his termination was merely pretext to discrimination (for the same reasons discussed below concerning his ADEA retaliation claim).

termination as MEDS did:  that he was fired after failing to take responsibility for or propose behavioral adjustments after numerous patient complaints.  The burden thus shifts back to Sanchez to rebut the Air Force's reasons as merely pretext for age discrimination.

As before, to demonstrate that the Air Force's reasons were pretextual and create a question of fact as to its intention in terminating Sanchez, he must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Air Force's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quotations and citation omitted).  A reason is not pretext "unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *Brooks*, 446 F.3d at 1163 (quotations and citation omitted) (emphasis in original).

Sanchez does not cast sufficient doubt upon the Air Force's proffered justifications to survive summary judgment.  As mentioned above, Sanchez produces no evidence (or even *alleges*) that the patient complaints upon which the Air Force relied were false or manufactured, or that he did not commit the infractions complained of.  While Sanchez did testify that O'Connor herself pushed patients to file complaints against him, nothing indicates those complaints were fabricated, or that O'Connor pushed patients because of Sanchez's age.  Instead, Sanchez admits that the complaints were submitted by actual patients and were concerning enough to be investigated by any employer.

Sanchez again points to his many positive reviews and to the subjective nature of the patient complaints he received.  It may well be true that he received more positive reviews than the few, subjectively negative reviews that the Air Force relied on.  But as

explained, this Court is "not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [its] sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision." *Damon*, 196 F.3d at 1361.  The Air Force can fire Sanchez "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quotations and citation omitted).  Sanchez does not *rebut* the Air Force's proffered reason so much as argue its wisdom and fairness.  That is not enough—Sanchez has not established a question of fact as to the Air Force's motive.  Thus, failing to meet his burden under *McDonnell Douglas*, his claim of retaliation in violation of the ADEA fails.

All told, Sanchez fails to satisfy his burden of proof or demonstrate a genuine question of material fact on any claim asserted against MEDS or the Air Force.  Thus, the Defendants are entitled to summary judgment on all claims.

## V.    Conclusion

Accordingly, and for good cause, it is

ORDERED that MEDS' motion for summary judgment as to Counts I, III, V, and VII (doc. 55) is GRANTED.  It is further

ORDERED that the Air Force's motion for summary judgment as to Counts II, IV, VI, and VIII (doc. 53) is GRANTED.

A separate final judgment will enter.

Done this 31st day of March, 2022.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE